## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

**DIANA D. BOWMAN,**

       **Plaintiff,**

**vs.**                             **Case No. 1:15cv8-MP/CAS**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

       **Defendant.**

_____/


## REPORT AND RECOMMENDATION

This is a Social Security case referred to the undersigned United States

Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and

Local Rule 72.2(D).   It is now before the Court pursuant to 42 U.S.C. § 405(g) for

review of the final determination of the Acting Commissioner (Commissioner) of the

Social Security Administration (SSA) denying Plaintiff's application for a period of

disability and Disability Insurance Benefits (DIB) and an application for Supplemental

Security Income (SSI).   After careful consideration of the entire record, it is

recommended that the decision of the Commissioner be reversed and remanded for

further proceedings.

## I.  Procedural History

On or about April 18, 2012, Plaintiff, Diana D. Bowman, filed a Title II application

for a period of disability and DIB alleging disability beginning March 29, 2012, due to

major depression, hypertension, severe migraines, stroke, chronic tinnitus (with partial hearing loss), C4-5 bulging disc (back and neck pain), C6-7 degenerated disc and decreased height, short-term memory loss, and lasting symptoms from stroke.   R. 18, 44-45, 168-69, 198, 202.   (Citations to the Record shall be by the symbol "R." followed by a page number that appears in the lower right corner.)   Plaintiff's last date of insured status for disability benefits is December 31, 2015.   R. 18, 198.   Plaintiff's claim was denied initially on August 6, 2012, R. 18, 106, 171-89, and upon reconsideration on October 10, 2012.   R. 85-100, 107-08, 114, 120.   On November 19, 2012, Plaintiff requested a hearing.   R.18, 121-22.   On March 24, 2014, Plaintiff filed a Title XVI application for SSI benefits that was "escalated to the hearing level."   R. 18, 121, 179-88.

On April 16, 2014, Plaintiff's counsel requested an on the record decision from Administrative Law Judge (ALJ) Stephen C. Calvarese and provided the ALJ with a summary of the record evidence.   R. 155-60.   In part, counsel advised the ALJ that Plaintiff "was considered an individual closely approaching advanced age and is now currently 54 ½ years old and could be considered an individual of advanced age for the purposes of the sequential evaluation."   R. 155; *see* R. 42 (Plaintiff testified that she was 54 years old and would be 55 in August 2014.).

On May 20, 2014, the ALJ held a video hearing.   R. 18, 38-70.   (During the hearing, the ALJ acknowleged reading the April 16, 2014, letter.   R. 41.)   Plaintiff appeared and testified during the evidentiary hearing in Gainesville, Florida, and the ALJ presided over the hearing from Jacksonville, Florida.   R. 18, 38-70.   Melissa

T. Brooks testified as an impartial vocational expert.   R. 18, 62-69, 123-24 (Resume).

Plaintiff was represented by Archie S. Blair, a non-attorney representative and a Florida

registered paralegal.   R. 18, 38, 54, 153-54.   (The ALJ noted that Plaintiff "designated

Elizabeth F. Stakenborg as the primary attorney representative, but Ms. Stakenborg did

not appear at the hearing (Exhibit 17B)."   R. 18; *see* R. 110-13, 167.)   On June 10,

2014, Plaintiff's counsel advised the ALJ that she had received the results of the mental

consultative examination report provided by Carmen Tozzo-Julian, Ph.D., and had no

objections to its consideration by the ALJ.   R. 271-72; *see* R. 458-66 (Exhibit 16F-May

22, 2014, report); *see infra* at 24-25.

On July 30, 2014, the ALJ entered his written decision concluding that Plaintiff is

not disabled.   R. 18-32.   On September 15, 2014, Plaintiff sought review of the ALJ's

decision with the Appeals Council and submitted a five-page memorandum in support of

the request for review, R. 11-14, 273-77, and additional evidence consisting of records

from the Florida Department of Education, Division of Vocational Rehabilitation dated

December 19, 2012, to January 30, 2014, and two pages from Mana E. Johnson, M.D.

dated July 11, 2014, pertaining to Listing 12.06.   R. 13-14, 479-85; *see* R. 5-6.   On

September 13, 2014, Plaintiff submitted a two-page supplemental memorandum.

R. 9-10.

On November 25, 2014, the Appeals Council denied review of the ALJ's

decision.   R. 1-7.   The Appeals Council noted, in part, that it would consider any "new

and material evidence," but further noted that any additional evidence submitted did "not

provide a basis for changing the [ALJ's] decision."   R. 1-2.   The Appeals Council "did

not consider records from the Center for Independent Living of North Central Florida, Vocational Education Services, dated August 22, 2013, because these records are a duplicate of Exhibit 11F, pages 3-13 [R. 436-46]."   R. 2.

On January 16, 2015, Plaintiff filed a Complaint and seeks judicial review of the adverse decision.   Doc. 1.   Both parties filed memoranda of law, which have been considered.   Docs. 15 and 16.   After careful consideration of the entire record, it is respectfully recommended that the decision of the Commissioner be reversed and remand for further proceedings.

## II.  Legal Standards

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. 42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance.   It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."   Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); *accord* Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).   "The Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).[1]

---

[1]   "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."   Phillips v. Barnhart, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted).   "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.   A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."   Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'" Bloodsworth, 703 F.2d at 1240 (citations omitted). A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1509 (duration requirement).[2] Both the "impairment" and the "inability" must be expected to last not less than 12 months. Barnhart v. Walton, 535 U.S. 212 (2002). In addition, an individual is entitled to DIB if she is under a disability prior to the expiration of her insured status. *See* 42

---

"Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

[2]   The relevant DIB and SSI regulations are virtually identical. As a result, citations will be made to the DIB regulations found at 20 C.F.R. §§ 404.1500-404.1599, unless a SSI regulation provides otherwise. The parallel regulations are found at 20 C.F.R. §§ 416.900-416.999, corresponding to the last two digits of the DIB citations, e.g., 20 C.F.R. § 404.1563(c) corresponds to 20 C.F.R. § 416.963(c).

U.S.C. § 423(a)(1)(A); Moore v. Barnhart, 405 F.3d at 1211; Torres v. Sec'y of Health &

Human Servs., 845 F.2d 1136, 1137-38 (1st Cir. 1988); Cruz Rivera v. Sec'y of Health

& Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

The Commissioner analyzes a claim in five steps.   20 C.F.R.

§ 404.1520(a)(4)(i)-(v):

1. Is the individual currently engaged in substantial gainful activity [SGA]?

2. Does the individual have any severe impairments?

3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4. Does the individual have the RFC to perform work despite limitations and are there any impairments which prevent past relevant work?[3]

5. Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits.   A positive finding at step three results in approval of the

application for benefits.   At step four, the claimant bears the burden of establishing a

---

[3]   A residual functional capacity is the most a claimant can still do despite limitations.   20 C.F.R. § 404.1545(a)(1).   It is an assessment based upon all of the relevant evidence including the claimant's description of her limitations, observations by treating and examining physicians or other persons, and medical records.   *Id.*   The responsibility for determining claimant's RFC lies with the ALJ.   20 C.F.R. § 404.1546(c); *see* Social Security Ruling (SSR) 96-5p, 1996 SSR LEXIS 2, at *12 (July 2, 1996) ("The term *"residual functional capacity assessment"* describes an adjudicator's finding about the ability of an individual to perform work-related activities. The assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence.").

severe impairment that precludes the performance of past relevant work.

Consideration is given to the assessment of the claimant's RFC and the claimant's past

relevant work.   If the claimant can still do past relevant work, there will be a finding that

the claimant is not disabled.   If the claimant carries this burden, however, the burden

shifts to the Commissioner at step five to establish that despite the claimant's

impairments, the claimant is able to perform other work in the national economy in light

of the claimant's RFC, age, education, and work experience.   Phillips, 357 F.3d at

1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131;

MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R.

§ 404.1520(a)(4)(v).   If the Commissioner carries this burden, the claimant must prove

that he or she cannot perform the work suggested by the Commissioner.   Hale v.

Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).   An ALJ may make this step five

determination either by applying the Medical-Vocational Guidelines (Grids) or by

obtaining the testimony of a vocational expert.   Phillips, 357 F.3d at 1239-40.

## III.  Findings of the ALJ

The ALJ made several findings relative to the issues raised in this appeal:

1.  "The claimant meets the insured status requirements of the Social Security
    Act through December 31, 2015."   R. 20.

2.  "The claimant has not engaged in substantial gainful activity [SGA] since
    March 29, 2012, the alleged onset date."   *Id.*

3.  "The claimant has the following severe impairments: residual effects of
    November 2009 cerebral vascular accident (CVA) or stroke, tinnitus,
    migraine headache, organic mental disorder, an anxiety disorder, and an
    affective disorder."   *Id.*

4.   "The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."   R. 22.   The ALJ determined that Plaintiff had no more than moderate restriction in activities of daily living; no more than moderate difficulties in social functioning and concentration, persistence or pace; and no episodes of decompensation, which have been of extended duration.   R. 22-23.

5.   "[T]he claimant has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) involving lifting/carrying 20 pounds occasionally and 10 pounds frequently; and, in an 8-hour workday with normal breaks, sit 6 hours, stand 6 hours, and walk 6 hours.   The claimant's ability to push/pull within the above lifting/carrying restrictions is unlimited.   The claimant must avoid concentrated exposure to noise, as well as fumes, odors, dusts, gases, poor ventilation, etc.   Despite moderate mental health limitations, she remains capable of performing simple tasks, with changes introduced slowly and gradually, and she should avoid contact with the general public."   R. 23-24.

6.   "The claimant is unable to perform any past relevant work" as a management trainee, light, skilled work, as generally performed, but medium as actually performed, with a Specific Vocational Preparation (SVP) of 6; and as a department manager, medium, skilled work, with an SVP of 7.   R. 30.

7.   "The claimant was born on August 25, 1959 and was 52 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date."   *Id.*   (Plaintiff was 54 years old as of the date of the ALJ's decision entered on July 30, 2014.)

8.   "Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules [the Grids] as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills."   *Id.*

9.   "Considering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform."   R. 31.   The ALJ determined that Plaintiff had the RFC to perform light work with exceptions and noted that a person who had the RFC to perform the full range of light work would be found "not disabled" by Medical-Vocational Rule 202.14.   *Id.*   This rule applies to a claimant who is closely approaching advanced age, ages 50-54.   The ALJ found that Plaintiff's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. Accordingly, the ALJ asked the vocational expert to opine whether Plaintiff

could perform jobs in the national economy given the factors mentioned above including her age of 52 as of the alleged onset date.   *Id.*; *see* R. 64   The vocational expert opined that Plaintiff could perform three light, unskilled jobs, with an SVP of 2--housekeeping cleaner, mail clerk, and marker.[4]   R. 31, 64-69.

## IV.   The Medical and Other Evidence

### A.   Evidence Before the ALJ

Plaintiff suffered a cerebral vascular accident (stroke) on November 17, 2009, and was admitted to Woodlands Care Center with an initial estimated length of stay of four weeks.   R. 289-90.   Her medullary CVA was complicated by migraine headaches, neck pain, and depression.   *See, e.g.,* R. 291, 303, 305-11, 314, 325, 327, 330, 334, 362.   She had a stiff neck and multiple bruises on the upper and lower extremities and her gait was unsteady.   *Id.*   She received physical and occupational therapy to address transfer skills.   On November 24, 2009, she was discharged home with support and was to receive home health care.   R. 313, 358, 362-63.   In part, Plaintiff was alert and oriented x3; coping well with all changes; and had no mood or behavioral issues.

On February 28, 2010, Plaintiff had a follow-up office visit with Jeffrey P. Borkoski, M.D., a neurologist.   R. 421- 22.   The patient records are difficult to read.   *Id.*   She presented with right arm weakness and pain, had difficulty walking, and had a positive history of depression.   R. 421.   She was alert and attentive; her language was

---

[4]   "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."   20 C.F.R. § 404.1568(a).   An SVP of 2 means "[a]nything beyond short demonstration up to and including 1 month."   Dictionary of Occupational Titles (DOT) (4th Ed., Rev. 1991), Appendix C: Components of the Definition Trailer, § II, SVP.

fluent; and her comprehension was intact.   *Id.*   She was diagnosed with CVA and

major depressive disorder and told to continue on Sertraline and Xanax, and it appears

she was to follow-up in one year.   R. 422.

Closer to the time of her onset date, from April 2012 through June 2012,

Plaintiff sought (was self-referred) psychological counseling from Bernard B. Bulcourf,

Ph.D., with Southeastern Psychology.   R. 409-16.   On April 17, 2012, she presented

with chronic pain, emotional distress, financial stressors, health/medical issues, physical

decline; sleep disturbance, and unresolved bereavement issues.   R. 415.   She was

originally seen in 2009 by Dr. Bulcourf while she was an inpatient at Woodlands Clinic in

2009.   *Id.*   Plaintiff reported migraines with aura, chronic low back pain, and chronic

insomnia.   Examination revealed her affect was restricted and her mood was anxious,

depressed, and discouraged.   Her motivation level was low.   Plaintiff was diagnosed

with major depressive disorder and generalized anxiety disorder and was assigned a

Global Assessment of Functioning (GAF) of 55.[5]   Her prognosis was guarded and she

---

[5]   The American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) (4th Ed. Text Revision 2000), includes the Global Assessment of Functioning (GAF) Scale that is primarily used by mental health practitioners.   The GAF Scale is used to report "the clinician's judgment of the individual's overall level of functioning" (with regard to only psychological, social, and occupational functioning) and "may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure."   DSM-IV-TR 32-34.   The GAF scale is divided into 10 ranges of functioning, each with a 10-point range in the GAF scale.   *Id.   See* Nichols v. Astrue, Case No. 3:11cv409/LC/CJK, 2012 U.S. Dist. LEXIS 119347, at *26-29 (N.D. Fla. Aug. 7, 2012) (discussing GAF scale).   A GAF scale rating of 41-50 is indicative of serious symptoms or any serious impairment in social, occupational or school functioning.   *Id.*   A GAF scale rating of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.*   A GAF scale rating of 61 to 70 indicates some *mild* symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning

was told to continue on Wellbutrin, Zoloft, and Xanax.   R. 415-16.   On May 9, 2012,

she presented to Dr. Bulcourf for individual therapy.   R. 411-12.   She was provided

with strategies on addressing sporadic auditory hallucinations and her GAF score

remained at 55.   *Id.*   On June 8, 2012, Plaintiff described having one auditory

hallucination since her last visit.   Her overall mood had improved and she started

increasing time spent socializing.   R. 409-10.   She continued in therapy to address

somatization disorders and increase her insight.   Her GAF score was 60, but her

prognosis remained guarded.   R. 410.

On July 13, 2012, and upon request of the state disability agency, Lance I.

Chodosh, M.D., examined Plaintiff.   R. 472-78.   She reported depression,

hypertension, severe migraines and late effects of stroke, partial hearing loss, tinnitus,

degenerative disc disease, and short-term memory loss.   R. 472.   She reported having

a stroke in 2009, being hospitalized for seven days, and then being transferred to a

rehabilitation facility and having to regain her walking ability.   She presently had altered

---

(e.g., occasional truancy, or theft within the household), but generally functioning pretty
well, has some meaningful interpersonal relationships.   *Id.*   The "Commissioner has
declined to endorse the GAF scale for 'use in the Social Security and SSI disability
programs,' and has indicated that GAF scores have no 'direct correlation to the severity
requirements of the mental disorders listings.'"   Wind v. Barnhart, 133 F. App'x 684,
692 n.5 (11th Cir. 2005) (citing 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)).   In the
Fifth Edition of the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5)
(2013), "[i]t was recommended that the GAF be dropped from DSM-5 for several
reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk,
and disabilities in its descriptors) and questionable psychometrics in routine practice.
In order to provide a global measure of disability, the WHO DSM-5 (*see* the chapter
"Assessment Measures")."   DSM-5 at 16; *see* Finley v. Colvin, Civil Action No. 3:12-
7908, 2013 WL 6384355, at *23 n.9 (S.D. W.Va. Dec. 5, 2013) ("It should be noted that
in the latest edition of the [DSM], the GAF scale was abandoned as a measurement
tool.").

sensation in her right arm and felt a sense of twisting and some heaviness in her right shoulder.   Her right hand tingled and cramped and she tended to drop objects unexpectedly from her right hand.   She had occasional thoughts of suicide but no intent and was experiencing some recent auditory hallucinations and major depression after her mother's death in 2009.   R. 472; *but see* R. 397 (On July 24, 2012, Plaintiff reported recently losing her mother and fiancé.)   She became nervous and emotional especially when walking into stores and had difficulty with motivation.   She could barely get out of bed some days.   *Id.*   She had been released from her job due to emotional difficulties.   R. 473.   Plaintiff indicated that she could not walk more than 100 yards without resting due to fatigue and shortness of breath.   Examination revealed brief tearfulness during her examination.   Her cervical range of motion was slightly decreased due to pain. Manual dexterity was questionably reduced on the right side. Dr. Chodosh wrote that Plaintiff was able to squat and rise with effort and had to pull herself up.   She could not stand continuously for more than 15 minutes; she could squat, but not lift more than ten pounds.   *Id.*   Her hands functioned fairly well, but slowly.   Her vision corrected well; she can drive; she reported some hearing loss, but did not need amplification.   *Id.*   She was healthy appearing, moderately obese woman of large build.   She was fully oriented, had normal speech pattern, and emotional affect, with brief tearfulness; and she was cooperative.   *Id.*   Her motor function was grossly normal in all four extremities with strength judged 5/5 throughout, including grips.   R. 474.   Her manual dexterity was questionably reduced on the right side, but she was able to write, remove and replace the screw cap on a small bottle with slight hesitation.

Her coordination was good; she had no drift outstretched arms; and her sensation was intact to soft touch and pin.   *Id.*   She was diagnosed with mental health issues and a separate psychological assessment was indicated.   R. 475.   He also diagnosed Plaintiff with migraine headaches, as described, tinnitus, but gross hearing seemed adequate, and history of stroke, but without significant residual neurological impairment. Based on objective evidence, Dr. Chodosh opined that Plaintiff was able to stand, walk, sit, and stoop, squat occasionally, kneel, and lift and carry up to fifteen to twenty pounds.   She could handle objects fairly well and could see, hear, and speak normally. *Id.*

On July 24, 2012, Plaintiff was seen by Robert Balbis, D.O.   R. 397-98.   Plaintiff reported recently losing her mother and her fiancé.   R. 397.   She presented with a past medical history of migraine headaches, stroke (medullary), depression, anxiety, and hypertension and was told to continue on Wellbutrin and Zoloft and follow up with neurology for CVA.   *Id.*   Her fibro/pain was stable and hypertension perfect, with labs needed.   R. 398.

On July 30, 2012, and upon request of the state disability agency, Carmen Tozzo-Julian, Ph.D., performed a psychological evaluation on Plaintiff to asses her level of functioning, rule out an affective disorder, and identify reasons she was unable to work.   R. 365-69.   She reported being let go from her job in October 2010 due to inappropriate behavior toward other staff and had been unable to obtain another job due to physical limitations related to her stroke and depression.   R. 365.   She described her past history of having a stroke in 2009 and undergoing an MRI of the brain that

indicated a small medullar infarct as well as a middle cranial arachnoid cyst.   She

reported severe depression, chronic tinnitus, back and neck pain due to bulging disc

and short-term memory loss.   R. 365-66.   Examination revealed she appeared

depressed with a restricted affect and was tearful throughout the interview.   R. 367.

Her gait, posture, and motor behavior were normal.     Speech was fluent and

expressive and receptive language were within the average range.   *Id.*   Digit span was

mildly impaired for backward span suggesting difficulty concentrating on backward

span.   Memory functions were moderately impaired and she had difficulty organizing

her thoughts.   *Id.*   She had no apparent delusions and denied hallucinatory

experiences.   Verbal reasoning skills were within the average range.   Plaintiff reported

feeling overwhelmed with grief and loss as she lost her mother and boyfriend two weeks

apart and had a stroke three weeks after burying her boyfriend of fifteen years.   She

described symptoms of feeling sad more days than not, tearfulness, difficulty

concentrating, irritability, fatigue, low motivation for many activities, decreased self-

esteem, decreased libido, social isolation, and low self-confidence.   She experienced

difficulty falling asleep and reported cutting her arms in May 2009.   Plaintiff also noted

chronic pain in her low back, neck, shoulder, and right arm.   Her mental status exam

suggested moderate memory deficits which were likely due to stroke and were

exacerbated by symptoms of severe depression.

   Dr. Tozzo-Julian further opined that her prognosis was guarded and she could

not operate heavy machinery or climb due to reported back, shoulder, and right arm

pain.   Plaintiff was able to produce quality work if she had frequent breaks and would

have difficulty learning more complex tasks.   She can learn simple directions.   She was not likely to have trouble getting along with supervisors and co-workers and not likely to have problems working with the public.   R. 368.   Her strengths were a previous work history and appeared well-adjusted prior to her stroke in 2009.   *Id.*   Her liabilities included chronic pain, moderate memory deficits, and current depression.   *Id.* It was recommended that she should continue therapy and pain management and counseling, including grief counseling, relaxation techniques, improve social supports and identify and change negative thought patterns.   *Id.*   Plaintiff was diagnosed with major depression, moderate recurrent, cognitive disorder due to stroke, chronic back and neck pain, tinnitus, hypertension, hyperlipidemia, and history of CVA.   She was assigned a GAF score of 55.   R. 369.

On September 10, 2012, upon request of Dr. Balbis, Plaintiff's primary care physician, Anthony E. Ackerman, M.D., Ph.D., a neurologist, examined Plaintiff during a return office visit with Dr. Jeffrey Borkoski.   R. 372-74.   Plaintiff reported pain on the left side of her head that was moderate to severe and lasted one to three days and she could not tolerate Topamax.   She also had experienced tinnitus for the past two years that worsened in both ears and described excessive daytime sleepiness.   Examination revealed sensation was decreased to light touch in the right upper extremity and she was diagnosed with migraine headache, chronic tinnitus, medullary stroke in 2009, suspected obstructive sleep apnea, hypertension, dyslipidemia, thyroid disease, depression, anxiety, and auditory hallucinations.   R. 373.   Plaintiff was told to continue on an aspirin for secondary stroke prevention, continue Zoloft, and take Cambia for

headaches, and to maintain good sleep hygiene, with regular exercise and weight control.   She was referred for a sleep study, but declined due to insurance difficulties.   R. 373.   Plaintiff was referred to Shands UF or Meridian Psychiatry for management of depression, anxiety, and auditory hallucinations.   R. 374.

On September 10, 2012, Plaintiff was treated by Dr. Bulcourf.   R. 375-76.   Her pain issues had increased over the past month and she was having more auditory hallucinations.   Her affect was restricted and her mood was anxious and depressed. She was diagnosed with major depression and anxiety, was assigned a GAF of 50, her prognosis remained guarded.   R. 376; *see supra* at n.5.

Plaintiff continued to suffer from chronic tinnitus and on September 19, 2012, was seen by Michele S. Hargreaves, M.D., at the request of Dr. Ackerman.   R. 403-04. She reported worsening tinnitus that interfered with her hearing as well as a history of migraine headaches, stroke and depression.   Plaintiff was diagnosed with bilateral mixed hearing loss, with asymmetry in the high frequencies.   Due to the asymmetry, Dr. Hargreaves recommended investigation to rule out retro-cochlear pathology. Plaintiff could not afford an MRI at this time and preferred an ABR and would follow-up afterwards.   R. 403.   Plaintiff was reassured that her tinnitus was typically a benign condition that is a symptom of hearing loss.   She was advised to avoid caffeine and NSAIDS.   It is noted that Plaintiff qualified for hearing aids through vocational rehabilitation and Plaintiff would meet with their audiologists.   *Id.*

On November 29, 2012, Plaintiff was examined by George Long, LMHC, a licensed evaluator at The Centers, Inc., for depression.   R. 378-90.   She had a

biopsychosocial assessment.   R. 378.   She reported symptoms of depression since 2009 after her mother died.   She reported being overwhelmed at work and cut herself at work with a box cutter, her boyfriend died, and she then had a stroke.   Plaintiff had lost her job and had current problems with tinnitus and hearing sounds like a television in her mother's room.   She reported her medications were not helping and she had current symptoms of constant depressed mood, sleep disturbance, poor appetite, memory and concentration difficulties, and low energy.   She sought a psychiatrist and a therapist she could afford as she was unemployed and uninsured.   *Id.*

Examination revealed her appearance was appropriate; behavior cooperative; and speech normal.   R. 378.   Her mood was dysphoric and she was "worried about finances."   *Id.*   Her affect was anxious, although her thought process was organized, but she had "concentration problems, rumination."   Her attention was adequate, judgment was good, impulse control fair, with limited coping skills.   R. 379.   She slept six hours in 24 hours.   She denied suicidal, homicidal, and assaultive ideations. R. 379-80.   She experienced concentration difficulties and rumination, auditory hallucinations, poor short-term memory, difficulty falling asleep, appetite loss and her coping skills are limited.   She was diagnosed with major depression recurrent, hypertension, tinnitus, arthritis, history of stroke and chronic pain and was assigned a GAF of 50.   R. 386-87. *See supra* at n.5.   She was referred to Meridian Behavioral as she did not reside in the correct county to receive services at the Centers and was told to continue on Zoloft, Xanax, and Lisinopril.   Her prognosis was fair.   R. 386, 388-89.

On December 19, 2012, Dr. Bulcourf completed a medical source statement on Plaintiff.   R. 391-94.   This statement had some narrative explanation, but for the most part consisted of checking boxes or areas.   *Id*.   Plaintiff was seen on a monthly basis for 45 minute sessions for migraines with aura, chronic back pain, insomnia, CVA, decreased mental and physical functioning, and poor coping skills.   R. 391.   Her signs and symptoms included poor memory, sleep disturbance, mood disturbance, emotional lability, delusions or hallucinations, recurrent panic attacks, feelings of guilt, social withdraw and isolation, decreased energy, persistent anxiety and somatization, unexplained by organic disturbance.   Her prognosis was guarded and her psychiatric conditions exacerbated her experience of pain.   *Id*.   Her pain symptoms would constantly be severe enough to interfere with attention and concentration needed to perform even simple tasks.   She would likely be absent from work more than three times a month.   R. 392.   Plaintiff would experience extreme limitations in her ability to maintain regular attendance, complete a normal workday or workweek without interruptions from psychologically based symptoms, perform at a consistent pace, and deal with normal work stress.   R. 393-94.   She would experience extreme deficiencies in concentration, persistence, or pace resulting in failure to complete tasks in a timely manner and four or more episodes of deterioration in a work-like setting which would cause her to withdraw or experience exacerbation of signs and symptoms.   R. 394.   She would have marked limitations in her ability to maintain attention for two-hour segments and get along with co-workers or peers without distracting them.   R. 393.   As a result of her impairments, she would likely be unable to complete an eight-hour

workday five days or more per month.   The above limitations had been in effect since April 17, 2012.   R. 394.   Plaintiff's past and current GAF scores were 55.   R. 391. *See supra* at n.5.

Plaintiff was seen on December 20, 2012, by Dr. Balbis for her chief complaint of pain in both knees and left ankle, although this was a follow-up of her migraines, depression, and anxiety.   R. 395-98.   It is noted she works at Books-A-Million in Ocala. R. 395; *see* R. 57-59 (Plaintiff's describes work at Books-A-Million for six years in Gainesville and six years in Ocala).   The examination results were generally normal. R. 395-85.   For example, she appeared healthy and in no distress.   R. 396.   She was continued on Zoloft for depression, a low dose of Seroquel was added, and a Xanax prescription was refilled.   Her fibromyalgia/pain was stable and Lortab was refilled. Bilateral x-rays for knee pain would be checked at her next visit when she could afford it and it was recommended that she change her shoes now.   *Id.*

On April 9, 2013, Dr. Ackerman treated Plaintiff for migraines.   R. 432-33.   She presented with migraines and chronic tinnitus and reported getting about six migraines a month.   She used Lortab in the past month for a severe migraine and takes Xanax for her tinnitus.   R. 432.   She was started on Amitriptyline in place of Trazadone and was told to continue on Diclofenac (which she reported as beneficial for migraine abortive) and Zoloft for headache prophylaxis.   R. 433.

Plaintiff continued to receive treatment for anxiety and depression from May 2013 to June 2013 by Dr. Balbis at Southeastern Primary Care.   R. 423-31.   On May 3, 2013, she presented with anxiety and depression.   R. 423-24.   She was told to

continue on Zoloft and to add Lamictal and Seroquel.   R. 424.   On June 5, 2013, she

complained of anxiety and depression and a review of systems indicated, in part "not

feeling poorly (malaise)."   R. 426.   Her history of present illness included anxiety,

emotional lability, initial insomnia, social withdrawal, apathy and low self-esteem.   *Id*.

She lived alone and had poor exercise habits.   She was oriented to time, place, and

person, was well developed and well nourished.   Grooming was normal.   R. 427.   She

was to taper down on Zoloft once after adding Lamictal and Seroquel that was

recommended by psychology, but she was unable to pick up these medications before

due to cost and was given starter kit for bipolar disorder and referred to a psychologist,

Dr. Bulcourf.   R. 428.

On June 24, 2013, she presented to Dr. Balbis to follow-up with hypertension,

CVA, and depression.   R. 429-31.   She thought she had experienced a reaction to the

Lamictal and stopped it after she developed a fever and a rash.   She had tried many

other medications in the past without help and was started on Lithium for depression

and Hydrocodone for her migraines.   R. 431.

On July 31, 2013, Plaintiff returned to Dr. Bulcourf for psychological counseling,

on a referral from Dr. Balbis.   R. 450-51.   Plaintiff denied any changes in functioning.

R. 450.   Her functional component of her social history included "normal activities of

daily living."   R. 450.   She presented with depression, anxiety, and sleep disturbances

as well as muscle aches, plain located to one or more joints, and joint stiffness localized

to one or more joints.   R. 451.   Examination revealed her appearance was normal,

mood was anxious and depressed, and her thought process and thought content were

not impaired.   *Id.*   She was diagnosed with moderate recurrent major depression, generalized anxiety disorder, and pain disorder associated with psychological factors and general medical condition and was assigned a GAF score of 55.   *Id.; see supra* at n.5.

Plaintiff was referred to vocational rehabilitation on August 22, 2013, with Andrea Melvin, CRC, CVE, with the Center for Independent Living of North Central Florida, Vocational Evaluation Services.   R. 436-46.   She underwent vocational testing, intelligence and aptitude testing, achievement testing, and behavioral observations. R. 439-42.   Her IQ Composite was 115 (Verbal 125; Non-Verbal 103).   R. 439 ("She should not have difficulty learning new information.").   Plaintiff was "interested in part-time employment in a clerical or cashier position."   *Id.*   "She prefers situations where she does not need to solve problems, she can use her imagination, she has clear rules to follow, she is not the person in charge, she does not have to interact with a large number of people, and beauty is important."   R. 440.   "Her highest aptitude is Word Knowledge, which is high.   Language Usage skills are a little above average.   Spatial Relations skills are average.   All other tested aptitudes were either a little below average or below average."   *Id.*   "During the Manual Speed and Dexterity section, she shook her hand, stated that her hand was numb, and reported that her entire arm and shoulder hurt.   She was observed to skip every 3rd column."   R. 441.   Her reading and language skills "are in good shape.   Remediation in Math may be needed if she were to enter an academic training program.   When shown these results, she stated that math is not her strongest area and she has forgotten a lot."   *Id.*

A situational assessment was administered.   R. 442.

Clerical tasks were simulated with Ms. Bowman.   The Clerical aptitude of the System for Assessment and Group Evaluation was administered.   She scored at level 1, which represents the top 10% of the population.   Every question that she attempted on all 4 subsections was correct.   She stood to complete the alphabetizing and zip code subsections of this assessment.

Her next task was mail sorting, where she had to place envelopes into the correct employee's box.   Prior to beginning the activity, she was alerted to the "Employees" box for people who did not have a box assigned to their name and to the fact that similar titles could be used.   She spent 11:42 on this task and had no errors.   She stood to complete this activity.   There were no complaints of pain or fatigue.

Her final task was file box alphabetizing.   She spent 11:47 on this task and had no errors.

Overall, her performance was excellent on all tasks.

*Id.*

Under the Behavioral Observations section, it is noted that Plaintiff arrived at

least ten minutes early for her appointment.   *Id.*   Her grooming and hygiene were

appropriate; her affect was anxious, especially at the beginning of the appointment.

She was cooperative with all tasks that were requested.   She worked quickly through

most assessments.   "There was some extraneous communication during the intake;

after that, she remained focused on her tasks.   There were no difficulties in following

verbal or written instructions."   *Id.*

The Summary of Findings, Vocational Exploration section provided in part:

Ms. Bowman needs to increase her computer skills.   She knows the basics of how to run a computerized cash register.   She enjoys books, and has isolated herself over the past few years.   She was encouraged to access her local library in Williston to work on her computer skills and engage with other people.

> She is interested in clerical and cashier work, but does not want the stress of management.   She also does not feel that she has the stamina to work full-time. She needs a position where she can change positions frequently, but extra breaks should not be needed.   In order for her to be employable in a clerical position, she will need to improve her Microsoft Office skills and typing speed to proficiency levels required by such positions.   These skills may be tested further at the Workforce Connection office.

R. 442.

> Recommendations included:

> It is very important that she continue to follow the treatment regimen prescribed by her physicians to minimize exacerbations of her physical and mental health disabilities.   She recently had her hearing evaluated, but does not know if she needs a hearing aid.   She reported that she had not had an eye exam in several years, and has noticed that her vision has recently changed.   She also stated that she is having balance and knee problems which have not been evaluated.

> She may need the assistance of a job placement specialist to assist with refreshing her employability skills and negotiating needed accommodations. She will need a position where she can change positions frequently.   Depending upon the type of position, an evaluation by a rehab engineer may be needed.

R. 444.

It was determined that Plaintiff was "currently employable" in several part-time positions," including cashier, teller, customer service representative, retails salesperson, receptionist and information clerk, and office clerk, general.   R. 444-45.   (It was noted that Plaintiff wanted "to work part-time."   R. 443.)

From October 2013 to April 2014, Dr. Balbis continued to treat Plaintiff for depression.   R. 447-49, 452-57.   On October 8, 2013, Plaintiff's chief complaint was a refill of medications, including Seroquel and Klonopin.   She explained that she stopped taking Lithium due to side effects.   R. 447.   She was diagnosed with bipolar disorder and was prescribed Seroquel and Alprazolam.   R. 448.

On December 6, 2013, Plaintiff presented with anxiety, depression, migraines, and weight gain.   R. 452-54.   She was up to 200 pounds and diagnosed with migraine with aura with intractable migraine and anxiety unspecified and was continued on Alprazolam and Lithium.   R. 454.   The assessment for depression noted that Plaintiff was off medications; she liked Lamictal but developed a rash and fever with it and stopped immediately as directed.   She tried Zoloft, Lexapro, Celexa, Paxil, Wellbutrin, and Effexor with no help and taking Lithium with improvement.   *Id*.

On April 4, 2014, Plaintiff described dizziness.   R. 455-57.   Lithium made her feel "bad/weird."   R. 455.   She was diagnosed with classic migraine with aura with intractable migraine and anxiety unspecified and was continued on Clonazepam and Lithium.   R. 457.   Her fibro/pain remained stable and notes regarding her depression remained the same.   *Id*.

On May 4, 2014, Dr. Bulcourf treated Plaintiff.   R. 467-69.   She presented with continued depression and unmotivated overall mood.   R. 467.   Her energy levels were low and she continued with headaches and tinnitus.   She had significant trust issues. Examination revealed her mood was depressed and anxious and she was diagnosed with moderate recurrent major depression, anxiety disorder, pain disorder, and was assigned a GAF score of 55.   R. 468; *see supra* at n.5.

On May 22, 2014, Dr. Tozzo-Julian examined Plaintiff at the request of the Disability office to rule out an affective disorder and reasons for her inability to work.   R. 462.   Plaintiff reported difficulty with depression, anxiety and memory difficulties after suffering a stroke in 2009.   On examination, Plaintiff got up several times during her

exam due to reported pain and her attention was mildly impaired.   Digit span was moderately impaired for backward span.   Her memory function was moderately impaired and her thought content focused on her pain and physical disabilities.   Mental status testing indicated mild attentional deficits and moderate memory deficits.   These deficits were likely due to moderate depression, anxiety, and cognitive deficits due to the stroke.   Plaintiff reported symptoms consistent with major depression and panic disorder.   Her prognosis was guarded.   Plaintiff would have difficulty driving and operating heavy machinery for long periods due to chronic neck and back pain.   She would have difficulty learning new tasks due to moderate memory deficits and have difficulty coping with work stressors and changes in routine due to moderate depression.   She might have difficulty working with the public because of depression and anxiety.   Dr. Tozzo-Julian also recommended individual therapy in addition to medication for her anxiety and depression.   Pain management was also recommended for her moderate to severe pain.   She was diagnosed with major depression moderate, recurrent and panic disorder. R. 465-66.

On May 29, 2014, Dr. Tozzo-Julian also completed a mental medical source statement regarding Plaintiff.   R. 459-61.   Plaintiff would have *moderate* difficulty in her ability to understand, remember and carry out complex instructions and respond appropriately to usual work situations and to changes in a routine work setting.   Plaintiff would have *no* difficulty understanding and remembering simple instructions and carry out simple instruction, and interacting with co-workers.   R. 459-60.   She had *mild* difficulty in her ability to make judgments on simple work-related decisions and the

ability to make judgments on complex work-related decisions, interacting with the public and with supervisors.   *Id.*   Plaintiff had *no* marked or extreme difficulty areas.   *Id.* Plaintiff had a history of depression and anxiety which affected her ability to handle stress.   R. 460.

### B.   Additional Evidence Before the Appeals Council

Records dated from approximately February 2013 through January 2014 include correspondence between the Florida Department of Education, Division of Vocational Rehabilitation and Plaintiff.   R. 5-6, 480-85 (Exhibit 19F).   On January 30, 2014, Plaintiff described being unable to obtain medical care due to lack of income.   Her records from Dr. Bulcourf and other medical records were reviewed.   Her diagnosis of major depression, anxiety disorder, CVA, tinnitus with hearing loss would affect her ability to obtain and maintain work.   Her case would be closed at this time because she was medically unstable at this time.   R. 480.

## V.   Legal Analysis

Plaintiff argues that the ALJ erred in mechanically applying the Grids to determine, at step five, that Plaintiff was not disabled and could perform several representative light, unskilled jobs, with SVP's of two.   Doc. 15 at 12-18.   Plaintiff argues that she was 54 years old, approximately one month shy of 55 years old, as of the date of the ALJ's decision, which qualified her for consideration under section 202.06 of the Grids as a person of advanced age (age 55 or over) rather than a person closely approaching advanced age (age 50-54) whose RFC is limited to light

work.[6]   *Id.*

The Commissioner argues that the ALJ properly applied the Grids and further argues that Plaintiff did not "offer any reason why the ALJ was required to consider her an individual of advanced age when in fact she was only fifty-four years of age on the date of the ALJ's decision."   Doc. 16 at 4.   The Commissioner agrees that Plaintiff's age was borderline, but argues that she did not "meet her burden of offering credible evidence that her ability to adapt was less than the level established under the Grids for persons of her age and with the other vocational characteristics."   *Id.* (citations omitted).   The Commissioner also suggests that the ALJ's reliance on the vocational expert's testimony supports his decision.   *Id.* at 4-5.

The ALJ determined that Plaintiff was not disabled under section 202.14 of the Grids, necessarily finding that she was a person of closely approaching advanced age (ages 50-54).   R. 31.   In reaching this determination, it is apparent that the ALJ considered Plaintiff's age as 52, her age on the alleged disability onset date, as the age for such determination.[7]   R. 30, Finding 7.   The ALJ did not expressly consider whether Plaintiff's age at the time of the hearing presented a "borderline" age situation. *See* 20 C.F.R. § 404.1563(b).

At step four, after consulting with Ms. Brooks, a vocational expert, the ALJ found

---

6   *See* 20 C.F.R. § 404.1563(d)-(e).

7   During the hearing, Plaintiff testified to her birthdate and stated that she was 54 years old.   R. 42.   The ALJ provided the vocational expert with hypothetical questions that included an assumption that Plaintiff was 52 years old as of the alleged onset date, which was true.   R. 64.

that Plaintiff could not perform her past relevant work as a management trainee or

department manage, both considered as light/medium, skilled work.   R. 30, 64-65.

*See* Phillips, 357 F.3d at 1240.   At step five, the ALJ is required to determine whether

considering Plaintiff's age, education, work experience, and RFC, there are jobs in the

national economy that Plaintiff can perform.   R. 31.   The ALJ agreed with the

vocational expert that Plaintiff could perform three representative light, unskilled jobs

with an SVP of 2.   R. 31.

One way for the ALJ and ultimately the Commissioner to carry the burden at step

five is through an application of the Grids.   *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2.

> The grids are a series of matrices which correlate a set of variables--the
> claimant's residual functional capacity (i.e., the ability, despite impairments, to do
> sedentary, light, etc. work), age, educational background, and previous work
> experience [including whether the previous work was skilled or unskilled].   Upon
> entry of a set of these variables into the appropriate matrix a finding of disabled
> or not disabled is rendered.

Gibson v. Heckler, 762 F.2d 1516, 1520 (11th Cir 1985).

In determining whether exclusive reliance on the Grids is appropriate, the ALJ

must first categorize the claimant's impairments as either exertional or non-exertional,

which the ALJ here considered, R. 31.   *See, e.g.,* Phillips, 357 F.3d at 1241-43.

Exertional impairments affect an individual's ability to meet the seven strength demands

of the job: sitting, standing, walking, lifting, carrying, pushing, and pulling.   *Id.* at 1241

n.11.   Non-exertional impairments affect an individual's ability to meet other work-

related commands and include limitations such as pain, medication side effects, and

depression.   MacGregor, 786 F.2d at 1054.   An ALJ may rely exclusively on the Grids

when each factor used in the determination describes the claimant's situation, and when

a case involves only exertional impairments.   Foote v. Chater, 67 F.3d 1553, 1559

(11th Cir. 1995).   In contrast, if the claimant has a non-exertional impairment that limits

a wide range of work at a given level, an ALJ is required to consult a vocational expert,

which the ALJ did in this case, R. 31.   *Id.*

Table No. 2 of the Grids lists various categories for persons with an RFC to

perform "maximum sustained work capability limited to light work as a result of severe

medically determinable impairment(s)."   20 C.F.R. Pt. 404, Subpt. P, App. 2, Table No.

2.   Each section has four considerations: age, education, previous work experience,

and decision, such as disabled or not disabled.   *Id.*

At step five, after reciting the general components of the Grids, R. 31, the ALJ

stated that if Plaintiff had the RFC to perform the full range of light work, a finding of not

disabled would be directed by the Grids, and, in particular pursuant to section 202.14,

because Plaintiff had a high school education or more, was closely approaching

advanced age (age 50-54), and had engaged in previous skilled or semi-skilled jobs

without transferable skills, R. 30-31; *see* 20 C.F.R. Pt. 404, Subpt. P, App. 2, Table No.

2, § 202.14.   (As noted, Plaintiff was 52 years of age as of the alleged onset date,

March 29, 2012, and 54 years of age on the date of the ALJ's decision, July 30, 2014.

R. 30, 32.)

The ALJ did not expressly state whether Plaintiff's age as of the date of his

decision was borderline and did not consider whether section 202.06, which applies to a

person of advanced age (age 55 and above), applied to Plaintiff who was 54 years old,

almost 55, at the time of the hearing and the ALJ's decision.   R. 31.   If he had, and

without further analysis, this section would have directed a finding of disabled.   20 C.F.R. Pt. 404, Subpt. P, App. 2, Table No. 2, § 202.06.

During the hearing, the ALJ asked Ms. Brooks to assume a person of Plaintiff's age (52, not 54), with the same work history education, and the RFC as found by the ALJ and inquired further whether such a person was capable of performing jobs in the national economy.   R. 64-65.   (The ALJ's summary of the evidence in the RFC portion of his decision is extensive.   R. 24-30.)   In response, Ms. Brooks testified that the individual could perform representative jobs such as a housekeeping cleaner, mail clerk, and marker.   R. 31, 65-66.   The ALJ did not find that Plaintiff had any limitations that affected her ability to perform these light, unskilled jobs with the noted RFC exceptions. R. 23, 31.

The regulations divide claimants into several age categories: "younger person" (under age 50); "person closely approaching advanced age" (age 50 to 54); and "person of advanced age" (age 55 or older).   20 C.F.R. § 404.1563(c)-(e).   Although age generally means "chronological age," the SSA "will use each of the age categories that applies to [the claimant] during the period for which [the SSA] must determine if [the claimant is] disabled.   [The SSA] will not apply the age categories mechanically in a borderline situation.   If [the claimant is] within a few days to a few months of reaching an older age category, and using the older age category would result is an determination or decision that [the claimant is] disabled, [the SSA] will consider whether to use the older age category after evaluating the overall impact of all the factors of [the claimant's] case."   20 C.F.R. § 404.1563(b).   The regulations further state:

(c) Younger person.   If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work.   However, in some circumstances, we consider that persons age 45-49 are more limited in their ability to adjust to other work than persons who have not attained age 45.   *See* Rule 201.17 in appendix 2.

(d) Person closely approaching advanced age.   If you are closely approaching advanced age (age 50-54), we will consider that your age along with a severe impairment(s) and limited work experience may seriously affect your ability to adjust to other work.

(e) Person of advanced age.   We consider that at advanced age (age 55 or older), age significantly affects a person's ability to adjust to other work.   We have special rules for persons of advanced age and for persons in this category who are closely approaching retirement age (age 60 or older). *See* § 404.1568(d)(4).

20 C.F.R. § 404.1563(c)-(e).   The classification of a person's age can be important because, in general, the higher the age category, the more lenient the standard for proving a disability.   *See* Social Security Ruling (SSR) 83-10, 1983 SSR LEXIS 30, at *20 (1983).

The regulations provide that older age is an increasingly adverse vocational factor for persons with severe impairments.   The chronological ages 45, 50, 55 and 60 may be critical to a decision.   However, the regulations also provide that age categories are not applied mechanically in borderline situations.   For example, a rule for an individual of advanced age (55 or older) could be found applicable, in some circumstances, to an individual whose chronological age is 54 years and 11 months (closely approaching advanced age).   No fixed guidelines as to when a *borderline* situation exists are provided since such guidelines would themselves reflect a mechanical approach.

SSR 83-10, 1983 SSR LEXIS 30, at *20 (emphasis added); *see* 20 C.F.R. § 404.1563(b).

"Under title II, a period of disability cannot begin after a worker's disability insured status has expired.   When the person last met the insured status requirement before the date of adjudication, the oldest age to be considered is the person's age at the date

last insured.   In these situations, the person's age at the time of decision making is immaterial."   SSR 83-10, 1983 SSR LEXIS 30, at *20.   Stated otherwise, in determining a claimant's age for the purposes of a disability determination, the ALJ must consider either the date last insured, if that date occurs before the date of the decision, *or, as here, the claimant's age as of the date of the decision, if the date of decision occurs before the last date insured.   See, e.g.*, <u>Hurter v. Astrue</u>, 465 F. App'x 648, 653 (9th Cir. 2012) (unpublished); <u>Byers v. Astrue</u>, 506 F. App'x 788, 790 (10th Cir. 2012) (unpublished); <u>Varley v. Sec'y of Health & Human Servs.</u>, 820 F.2d 777, 780 (6th Cir. 1987).   Plaintiff's last date insured for DIB occurred December 31, 2015, after the date of the ALJ's decision, so her age is considered as of the date of the ALJ's decision or 54 years old, less than one month from Plaintiff's 55th birthday.   R. 30.

The Grids provide a narrative explanation for those individuals who have the RFC and the maximum sustained work capability limited to light work as a result of severe medically determinable impairment(s).   20 C.F.R. Pt. 404, Subpt. P, App. 2, Table No. 2, § 202.00(b)-(d).

> (b) The functional capacity to perform a wide or full range of light work represents substantial work capability compatible with making adjustments to substantial numbers of unskilled jobs and, thus, generally provides sufficient occupational mobility even for severely impaired individuals who are not of advanced age and have sufficient educational competence for unskilled work.

> (c) However, for individuals of advanced age who can no longer perform vocationally relevant past work and who have a history of unskilled work experience, or who have only skills that are not readily transferable to a significant range of semi-skilled or skilled work that is within the individual's functional capacity, or who have no work experience, the limitations in vocational adaptability represented by functional restriction to light work warrant a finding of disabled.   Ordinarily, even a high school education or more which was completed in the remote past will have little positive impact on effecting a

vocational adjustment unless relevant work experience reflects use of such education.

(d) Where the same factors in paragraph (c) of this section regarding education and work experience are present, but where age, though not advanced, is a factor which significantly limits vocational adaptability (*i.e.*, closely approaching advanced age, 50-54) and an individual's vocational scope is further significantly limited by illiteracy or inability to communicate in English, a finding of disabled is warranted.

20 C.F.R. Pt. 404, Subpt. P, App. 2, Table No. 2, § 202.00(b)-(d).

The term "borderline" is not specifically defined either by statute or by the governing regulations.   *See* Harrell v. Bowen, 862 F.2d 471, 479 (5th Cir 1988) (per curiam).   Although the regulations refer to a "borderline situation" in the context of "the age categories," it merely provides that the Commissioner will consider applying an older age category if the claimant is "within a few days to a few months of reaching an older age category."   *See* 20 C.F.R. § 404.1563(b).   As noted above, SSR 83-10, states that "[n]o fixed guidelines as to when a borderline situation exists are provided since such guidelines would themselves reflect a mechanical approach."   SSR 83-10, 1983 SSR LEXIS 30, at *20.

Courts have reached conflicting results when applying the qualification that a claimant be "within a few days to a few months" of reaching the older age category.   *Compare, e.g.,* Phillips v. Astrue, 671 F.3d 699, 703 (8th Cir. 2012) (holding that claimant within four months of 55th birthday at time of ALJ's decision was in borderline situation), *with* Woods v. Chater, 1996 U.S. Dist. LEXIS 14331, 1996 WL 570490, at *5 (N.D. Cal. Sept. 27, 1996) (holding that claimant within four months of 55th birthday at time of ALJ's decision was not in borderline situation).   In general, courts have declined to announce a bright-line rule for what constitutes "borderline" age.   *See, e.g.,* Phillips, 671 F.3d at 703 ("We decline to draw a bright line for purposes of this case.").   This approach is supported by SSR 83-10, 1983 SSR LEXIS 30.   A growing number of courts, however, appear to hold that a claimant within six months of an older age category presents a borderline age situation.   *See, e.g.,* Lewis v. Comm'r of Soc. Sec., 666 F. Supp. 2d 730, 738 (E.D. Mich. 2009) ("Generally, courts hold that a

person within six months of the next higher age category is considered 'borderline.'"); <u>Gallagher v. Astrue</u>, 2009 U.S. Dist. LEXIS 29867, 2009 WL 929923, at *6 (D.N.H. Apr. 3, 2009) ("Although the courts have varied in their interpretation of in what period of time the borderline range falls, the general consensus is that the borderline range falls somewhere around six months from the older age category.") (citation and internal quotation marks omitted); <u>Pickard v. Comm'r of Soc. Sec.</u>, 224 F. Supp. 2d 1161, 1168 (W.D. Tenn. 2002) (adopting magistrate judge recommendation) ("The courts have attempted to [define 'borderline situation'], generally concluding that the borderline range falls somewhere around six months from the older age category.".

<u>Manning v. Colvin</u>, Civil Action No. 3:13-CV-2178-D, 2014 U.S. Dist. LEXIS 8799, at *11-13 (N.D. Tex. Jan. 24, 2014); *see* <u>Pettway v. Astrue</u>, CA 10-127-C, 2010 U.S. Dist. LEXIS 101693, at *9-13 (S.D. Ala. Sept. 27, 2010), for a collection of cases referring to borderline age situations, concluding "that six months from the older age category is the extent to which courts will recognize a borderline age situation." *Id.* at *10.

According to the Commissioner's Hearings, Appeals, and Litigation Law Manual (HALLEX), which is used to identify borderline age situations when making disability determinations, adjudicators will apply a two-part test: (1) determine whether the claimant's age is within a few days or a few months of a higher age category; (2) if so, determine whether using the higher age category would result in a decision of "disabled" instead of "not disabled."   If the answer to one or both is "no," a borderline age situation either does not exist or would not affect the outcome, and the adjudicator will then use the claimant's chronological age.   HALLEX § II-5-3-2 Application of the Medical-Vocational Guidelines in Borderline Age Situations (S.S.A.), 2003 WL 25498826 (2003). If the answer to both is "yes," a borderline age situation exists and the adjudicator must decide whether it is more appropriate to use the higher age or the chronological age.

*Id.*[8]   *See infra* at n.9.

The claimant must show progressively more "vocational adversities" to support use of the higher age category as the time period between the claimant's actual age and his attainment of the next higher age category lengthens.   *Id.*   Examples of vocational adversities are the presence of an additional impairment which infringes upon a claimant's remaining occupational base.   *Id.*   Absent a showing of any additional adversities justifying use of the higher age category, the adjudicator will use the claimant's chronological age even when the time period to the next higher category is only a few days.   *Id.*

While the law is relatively clear on *what* the ALJ is to consider in deciding whether to veer from a claimant's chronological age in a borderline situation, the law regarding the ALJ's duties in considering such a situation is muddled.   The regulations impose no procedural requirement to make specific findings in borderline situations; however, the regulatory guidance is inconsistent on this issue.   *Compare* HALLEX II-5-3-2, 2003 WL 25498826 ("Absent a showing of additional adversity(ies) justifying use of the higher age category, the adjudicator will use the claimant's chronological age-even when the time period is only a few days.   *The adjudicator need not explain his or her use of the claimant's chronological age.*") (emphasis added); *with* Program Operations Manual System (POMS), DI 25015.005 Age as a Vocational Factor (Apr. 22, 2011),

---

8   "The [HALLEX] is a policy manual written by the [SSA] to provide policy and procedural guidelines to ALJs and other staff members."   *See* Howard v. Astrue, 505 F. Supp. 2d 1298, 1300 (S.D. Ala. 2007) (citing Moore v. Apfel, 216 F.3d 864, 868 (9th Cir. 2000)).

section D.4. ("When a borderline age situation exists, you must explain your decision to use the next higher age category or your decision to use the claimant's chronological age and explain the specific factors supporting your determination.").[9]

Although the regulations do require the ALJ's decision to "give[] the findings of fact and the reasons for the decision[,]" 20 C.F.R. § 404.953(a), the regulations themselves do not specifically impose upon the ALJ a procedural requirement to acknowledge the existence of, or make specific factual findings regarding, borderline age situations.   Section 404.1563(b) imposes only a duty to "consider whether to use the older age category after evaluating the overall impact of all the factors of your case." 20 C.F.R. § 404.1563(b).

As for case law, there is a split of authority as to what extent the ALJ must explicitly acknowledge and analyze a borderline age situation in his written decision. The Sixth and Ninth Circuits hold that an ALJ is not required to explain in his written decision whether he considered the borderline age situation.   *See* Lockwood v. Comm'r of Soc. Sec. Admin., 616 F.3d 1068, 1071-72 & n.4 (9th Cir.2010); Bowie v. Comm'r of Soc. Sec., 539 F.3d 395, 399-403 (6th Cir.2008).[10]   The rationale for this approach is

---

9   The POMS also provides that "[i]f the answer to both is 'yes,' a borderline situation exists, but use of the higher age category is not automatic."   POMS, an internal SSA document, DI 25015.005 Age as a Vocational Factor (Apr. 22, 2011).   *See* https://secure.ssa.gov/apps10/poms.nsf/1mx/0425015005 (last accessed Aug. 17, 2015) (*cited* in Ash v. Colvin, Civil Action No. 2:13-CV-47, 2014 U.S. Dist. LEXIS 63171, at *20-21 (N.D.W.Va. Apr. 15, 2014), *adopted*, 2014 U.S. Dist. LEXIS 63172 (N.D. W.Va. May 7, 2014).   "The POMS does not have the force of law, but it is persuasive authority."   Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1005 (9th Cir. 2006).

10   There are some courts that include Miller v. Comm'r of Soc. Sec., 241 F. App'x 631 (11th Cir.2007) (unpublished) with the circuits that have rejected a *per se*

that, while ALJs are not to apply the age categories mechanically, nothing in the

relevant statute or governing regulations requires an ALJ to address the claimant's

borderline age situation in his opinion.   *See, e.g.*, <u>Bowie</u>, 539 F.3d at 399 (explaining

rationale).   *See* HALLEX II-5-3-2, 2003 WL 25498826, <u>supra</u>, affording some support

for this view.   The Third, Eighth, and Tenth Circuits have taken the opposite view,

holding that the ALJ is required to explain in his written decision whether he considered

the borderline age situation.   *See* <u>Phillips v. Astrue</u>, 671 F.3d 699, 706-07 (8th Cir.

2012); <u>Lucas v. Barnhart</u>, 184 F. App'x. 204, 208 (3d Cir. 2006); <u>Daniels v. Apfel</u>, 154

F.3d 1129, 1133, n.5 (10th Cir.1998); <u>Kane v. Heckler</u>, 776 F.2d 1130, 1134 (3d Cir.

1985).[11]   The rationale for this approach is that placing the claimant in an age category

is a factual finding that must be supported by substantial evidence, and without knowing

it being mentioned in the ALJ's written decision, a reviewing court cannot meaningfully

analyze the ruling under the substantial evidence standard.   *See, e.g.*, <u>Daniels</u>, 154

F.3d at 1136 (explaining rationale); *see also* <u>Bowie</u>, 539 F.3d at 404 (Moore, J.,

dissenting) (same).   The Fourth Circuit has not addressed the issue, but most courts

procedural requirement.   *See, e.g.*, <u>Manning v. Colvin</u>, Civil Action No. 3:13-CV-2178-D, 2014 U.S. Dist. LEXIS 8799, at *19-20 (N.D. Tex. Jan. 24, 2014); <u>Ash v. Colvin</u>, Civil Action No. 2:13-CV-47, 2014 U.S. Dist. LEXIS 63171, at *21-22 (N.D.W.Va. Apr. 15, 2014).   Unpublished decisions of the Eleventh Circuit, however, are not binding precedent.   *See* 11th Cir. R. 36-2.

   [11]   One district court distinguished <u>Daniels</u> because the Appeals Council "recognized that a borderline age situation existed, 'considered the overall impact of all factors in the case,' and then found no additional vocational adversities that would have warranted using the next higher age category.' (R. 8) -- **as opposed to finding that claimant failed to meet his burden to show vocational adversities justifying the use of the higher age category**."   <u>Pettway v. Astrue</u>, CA 10-127-C, 2010 U.S. Dist. LEXIS 101693, at *19 (S.D. Ala. Sept. 27, 2010) (citing <u>Bowie</u>, 539 F.3d at 401).

within the Fourth Circuit have found that the borderline age analysis must be explicit in order for the reviewing court to determine if the decision was based on substantial evidence.   *See, e.g.*, Pickett v. Astrue, 895 F. Supp. 2d 720, 724-25 (E.D. Va. 2012) (remanding because "[t]he greater weight of authority leads to the conclusion that the ALJ's failure to explicitly address the borderline age issue provides [an] insufficient basis for review").   It has been noted that "[d]istrict courts in the Fifth Circuit have generally adopted a middle ground.   They have rejected a per se requirement that the ALJ must *always* explain in his written decision whether he considered the borderline age issue, but they have held that, in cases where there is no explanation of the issue and there is an indication that the claimant might be considered disabled under a different Guidelines rule, a remand is proper."   Manning, 2014 U.S. Dist. LEXIS 8799, at *21 & n.8.

Based on the foregoing and in the absence of controlling precedent from the Eleventh Circuit, the Court concludes that under the facts presented in this case, the ALJ erred when he did not explain in his written decision whether he considered the borderline age issue.   *See, e.g.*, Manning, 2014 U.S. Dist. LEXIS 8799, at *24-25; *but see* Roark v. Comm'r of Soc. Sec., Case No. 6:14-cv-Orl-37TBS, 2015 U.S. Dist. LEXIS 34996, at *7-11 (Jan. 29, 2015) ("The United States Court of Appeals for the Eleventh Circuit has not decided whether ALJ's have a responsibility to identify borderline age situations where relevant and courts within the circuit disagree.   I am persuaded by those cases that do assign this responsibility to the ALJ." (citations omitted)), *adopted*,

2015 U.S. Dist. LEXIS 35004, at *2-3 (M.D. Fla. Mar. 20, 2015).[12]    In the circumstances

presented here, the Court concludes that a remand is necessary because the Court is

unable to determine from the record whether the ALJ considered the borderline

situation, implicitly or otherwise, and, without this explanation, it cannot conclude that

the ALJ's decision is supported by substantial evidence.

The ALJ correctly noted in his decision that, at step five of the sequential

process, he must determine whether the claimant is able to do any other work

considering her age, RFC, education, and work experience.    But after explaining his

finding at step four, the ALJ stated: "The claimant was born on August 25, 1959 and

was 52 years old, which is defined as an individual closely approaching advanced age,

---

[12]   The district court made the following observations when ruling on the
Commissioner's objections:

> Upon consideration of the record as a whole and the Commissioner's objections,
> the Court agrees with Magistrate Judge Smith's comprehensive, well-reasoned
> R&R (Doc. 19, pp. 4-10), and finds that this case is similar to *Rogers v. Comm'r
> of Soc. Sec.*, No. 6:12-cv-1156-Orl-GJK, 2013 U.S. Dist. LEXIS 135832, 2013
> WL 5330452, *3-4 (M.D. Fla. Sept. 23, 2013).    Relying on the fact that "the
> Appeal's Council's order [did] not even acknowledge that [a] borderline situation
> [existed], much less discuss it," the *Rogers* court required that "[o]n remand . . .
> the ALJ shall provide Claimant an opportunity to be heard on this [borderline
> situation] issue, and shall make an individualized determination of the age factor
> and expressly articulate their consideration of the Claimant's borderline
> situation."    2013 U.S. Dist. LEXIS 135832, [WL] at *5.    The same should
> happen here.    The Commissioner's objections are simply an unpersuasive
> rehash of its prior arguments.    Thus, the R&R is due to be adopted, the
> Commissioner's decision is due to be reversed, and this case is due to be
> remanded.

2015 U.S. Dist. LEXIS 35004, at *2-3 (footnote omitted).    The Court rejected the
Commissioner's reliance on <u>Bowie</u> and noted that "[f]or the sake of consistency within
this District, the Court, adopts the holding and analysis of *Rogers* until the Eleventh
Circuit adopts the *Bowie* or a similar holding."    *Id.* at *3 n.1.

on the alleged disability onset date (20 CFR 404.1563 and 416.963)."   R. 30.   At step

five, the ALJ found: "Considering the claimant's age, education, work experience, and

[RFC], there are jobs that exist in significant numbers in the national economy that the

claimant can perform[.]"   R. 31.   Although the ALJ correctly identified Plaintiff's

birthdate, R. 30, the ALJ's decision does not mention Plaintiff's age as of the date of the

decision (or her age as of the hearing), notwithstanding being advised prior to and

during the hearing that she was 54 years old.   R. 42.   The ALJ only refers to her

birthday and age as of the date of her alleged onset date, which was over two years

earlier (Mar. 29, 2012, R. 18, 20, 30).   Further, the ALJ asked the vocational expert to

assume, in part, an individual, Plaintiff, "who was 52-years of age at the alleged onset

date."[13]

R. 64.   At step five, the ALJ relied on the vocational expert's testimony, *see* R. 64-66,

when he concluded that Plaintiff could perform at least three representative light,

unskilled jobs with an SVP of two.[14]   R. 31.

     Notwithstanding being advised at the outset of the hearing that Plaintiff was 54

---

[13]   The expert's testimony concerning Plaintiff's capacity was based on the predicate that Plaintiff was closely approaching advanced age.   *See* Garner v. Heckler, 735 F.2d 1291, 1291-92 (11th Cir. 1984) (claimant was 49 years and 10 months at time of ALJ's determination and vocational expert testified claimant was a younger individual rather than person closely approaching advanced age).

[14]   The ALJ does not cite to 20 C.F.R § 404.1563 at steps four or five.   R. 30-31.   The ALJ refers to this section in Finding 7 after he refers to Plaintiff's age of 52, "which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563 and 416.963)."   R. 30.   *See* Manning, 2014 U.S. Dist. LEXIS 8799, at *26 & n.10 (concluding ALJ's citation to this regulation was not sufficient basis to conclude ALJ adequately addressed borderline age issue).

years old, R. 42, and references in the record of Plaintiff date of birth, *see, e.g.*, R. 198, these factors, coupled with the ALJ's references to Plaintiff's age of 52 at the time of the alleged onset date, are not a sufficient basis for the Court to conclude that the ALJ in fact recognized that Plaintiff was 54 years old at the time of the ALJ's decision and within a month of her 55th birthday.

Under the circumstances presented, a remand is necessary because Plaintiff aged into the borderline age situation during the period between the alleged onset date (when she was 52 years old more than three years away from the next older age category) and the date of the ALJ's decision (when she was 54 years old and less than one month away from the next older age category).   It is not possible to determine from the ALJ's decision whether he realized this fact.[15]   *See, e.g.,* Manning, 2014 U.S. Dist. LEXIS 8799, at *27, and cases cited therein.

The Commissioner relies on Miller, 241 F. App'x 631.   Doc. 16 at 56; *see supra* at n.10.   The facts in Miller are distinguishable.   The record indicated that Miller was 54 years old at the time of hearing; the ALJ noted that "as a 54-year-old, Miller was 'an

---

[15]   The Court notes that Plaintiff's legal representative provided the ALJ with a pre-hearing letter date April 16, 2014, advising the ALJ of Plaintiff's date of birth and that she was currently 54 years old and "could be considered an individual of advanced age for the purposes of the sequential evaluation."   R. 155 (Exhibit 15B).   (Plaintiff's legal representative raised this issue before the Appeals Council.   R. 9-10, 277.   The Appeals Council did not expressly respond to this issue.   R. 1-8.)   At the outset of the hearing, Plaintiff's non-attorney representative referred to this letter as Exhibit 15B, and relied on it for his opening statement.   R. 41.   The ALJ said he read the letter.   *Id.* This adds to the Court's puzzlement as to the absence of any discussion by the ALJ in his written decision of Plaintiff's age as of the date of his written decision and the borderline age issue especially when he correctly recited Plaintiff's birthdate.   R. 30.

individual closely approaching advanced age' and that Miller had work skills that were

transferable to other semiskilled jobs."   *Id.* at 633.   The ALJ found that, under the Grids

(section 202.15), a finding of not disabled would be required.   *Id.*   The ALJ used the

vocational expert's testimony, which included consideration of Miller's age (presumably

54), to conclude that Miller could perform jobs in the national economy.   *Id.*

Apparently, the ALJ used the correct age.   *Id.*   The Court rejected Miller's argument

that the ALJ should have treated him as a person of advanced age.   *Id.* at 635-36.   In

Miller, at least the AlJ correctly noted Miller's age at the time of the hearing and the

ALJ's decision.   *Id.*   Also, "Miller's only reason in support of his contention that he

should have been treated as a person of advanced age is that he was only two months

short of turning 55 at the time of the hearing and the ALJ's decision."   *Id.* at 636.

Here, Plaintiff argues that the ALJ did not consider Plaintiff's applicable,

borderline age in his written decision in order to render a supportable determination

under the Grids and Plaintiff had additional adversities in that "she suffers from

environmental limitations, hearing loss, inability to interact with the public, limitation to

simple tasks with gradual changes, etc."   Doc. 15 at 17.   Plaintiff also refers to the

POMS provision setting forth additional adversities that apply to Plaintiff such as mild to

moderate hearing loss that still allows the claimant to hear and understand

conversational speech; environmental limitations that do not substantially reduce the

remaining occupational base; difficulty understanding detailed instructions; inability to

maintain attention and concentration for extended periods; and inability to interact

appropriately with the general public.   *Id.*   Plaintiff suggests that given these factors,

the ALJ could not mechanically apply the Grids in her case because she was one month away from being disabled under section 202.06.   In other words, Plaintiff argues that she "proffered the required evidence to establish that she suffers from additional adversities that should have been evaluated by the ALJ to determine if the advanced age Grid rule should have applied."   Doc. 15 at 17-18.   The Court agrees that Plaintiff has made a sufficient evidentiary showing on Plaintiff's ability to adapt, which should have been considered by the ALJ.   *See* Reeves v. Heckler, 734 F.2d 519, 525-26 (11th Cir. 1984).   Under the facts represented, the ALJ mechanically applied the Grids without indicating that he considered the borderline age issue.   *See* Ash v. Colvin, 2014 U.S. Dist. LEXIS 63171, at *31-32.   As a result, substantial evidence does not support the ALJ's determination that Plaintiff is not disabled, notwithstanding his reliance on the testimony of the vocational expert.[16]   On remand, the Appeals Council and/or ALJ shall provide Plaintiff an opportunity to be heard on the borderline age issue and shall make an individualized determination of the age factor and expressly articulate their consideration of Plaintiff's borderline situation.   *See, e.g.*, Roark v. Comm'r of Soc. Sec., 2015 U.S. Dist LEXIS 35004, at *2-3, and cases cited therein.

## VI.  Conclusion

Considering the record as a whole, the findings of the Administrative Law Judge are not based upon substantial evidence in the record and he did not correctly follow the

---

[16]   In light of the resolution of this issue, it is not necessary to consider Plaintiff's second argument that the ALJ did not adequately address and explain his reasons for not crediting the opinions of Dr. Tozzo-Julian and Dr. Bulcourf.   Doc. 15 at 18-23.   *See* Roark, 2015 U.S. Dist. LEXIS 34996, at *14 (citations omitted).   No opinion is rendered whether Plaintiff is disabled or entitled to benefits.

law.   Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny

Plaintiff's applications for Social Security benefits be **REVERSED** pursuant to sentence

four of 42 U.S.C. § 405(g) and the matter **REMANDED** for further proceedings.

IN CHAMBERS at Tallahassee, Florida, on August 20, 2015.

s/   **Charles A. Stampelos**
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.   A party may respond to another party's objections within 14 days after being served with a copy thereof.   Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**